ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ROBYN K. BACON (Cal. Bar No. 251048)
Assistant United States Attorney
Violent and Organized Crime Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4667
     Facsimile:  (213) 894-3713
     E-mail:     robyn.bacon@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>RUSTY STEVEN SETSER<br><br>A Fugitive from the Government of Australia | No. CV 13-3924-DSF-FFM<br><br><u>UNITED STATES' MEMORANDUM OF POINTS AND AUTHORITIES REGARDING EXTRADITION; EXHIBITS</u><br><br>Hearing Date: August 12, 2013<br>Hearing Time: 10 a.m.<br>Place: Courtroom of the Honorable<br>           Frederick F. Mumm |

1         Complainant United States of America, by and through its

2   counsel of record, the United States Attorney for the Central

3   District of California, hereby submits the following Memorandum of

4   Points and Authorities and the attached Declaration of Robyn K.

5   Bacon and exhibits thereto in support of extradition in this matter.

6

7

8   Dated: July 8, 2013          Respectfully submitted,

9                         ANDRÉ BIROTTE JR.
                      United States Attorney

10

11                        ROBERT E. DUGDALE
                      Assistant United States Attorney
                      Chief, Criminal Division

12

13                                /s/
                      _____
                      ROBYN K. BACON

14                        Assistant United States Attorney

15                        Attorneys for Plaintiff
                      UNITED STATES OF AMERICA

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.      INTRODUCTION................................................1

II.     STATEMENT OF FACTS..........................................2

        A.    The Fugitive And The Offense Conduct....................2

        B.    Criminal Charges And Arrest Warrant Filed In Australia...7

        C.    Australia's Request For Extradition And Brandt's Arrest
              In This District.......................................7

III.    APPLICABLE LAW..............................................8

        A.    General Standards And Procedures Of Extradition Law......8

        B.    Standards Of Treaty Interpretation In Extradition
              Proceedings...........................................10

        C.    Requirements For Certification Of Extraditability.......11

        D.    Inapplicability Of Federal Rules Of Criminal Procedure
              And Evidence..........................................15

        E.    Limitations Of Fugitive's Evidence....................17

        F.    Motivation Of And Expected Treatment In Demanding
              Country: The Rule Of Non-Inquiry......................18

IV.     ARGUMENT...................................................19

        A.    The Court Has Subject Matter Jurisdiction.............20

        B.    The Court Has Personal Jurisdiction Over The Fugitive...20

        C.    The Extradition Treaty Is In Force....................20

        D.    The Fugitive Is Sought For Offenses Covered By The
              Extradition Treaty....................................21

        E.    There Is Probable Cause To Believe That Brandt
              Committed The Offenses Charges........................23

V.      CONCLUSION.................................................25

**TABLE OF AUTHORITIES**

**Federal Cases**

Arnbjornsdottir-Mendler v. United States,
    721 F.2d 679 (9th Cir. 1983)...................................18

Austin v. Healey,
    5 F.3d 598 (2d Cir. 1993).....................................11

Barapind v. Reno,
    225 F.3d 1100 (9th Cir. 2000)................................7, 8

Bingham v. Bradley,
    241 U.S. 511 (1916).......................................10, 15

Blaxland v. Commonwealth Director of Public Prosecutions,
    323 F.3d 1198 (9th Cir. 2003)..................................8

Charlton v. Kelly,
    229 U.S. 447 (1913)...................................14, 16, 19

Collins v. Loisel,
    259 U.S. 309 (1922)...............................12, 13, 15

Cornejo-Barreto v. Seifert,
    218 F.3d 1004 (9th Cir. 2000)....................7, 8, 10, 18

Cucuzzella V. Keliikoa,
    638 F.2d 105 (9th Cir. 1981)...............................9, 13

Desmond v. Eggers,
    18 F.2d 503 (9th Cir. 1927)...................................16

Eain v. Wilkes,
    641 F.2d 504 (7th Cir. 1981)..........................16, 18, 22

El Al Israel Airlines, Ltd. v. Tseng,
    525 U.S. 155 (1999)...........................................10

Emami v. U.S. District Court for N. Dist. Cal.,
    834 F.2d 1444 (9th Cir. 1987)........................13, 15, 22

Factor v. Laubenheimer,
    290 U.S. 276 (1933)........................................9, 10

Fernandez v. Phillips,
    268 U.S. 311 (1925)...........................................10

Glucksman v. Henkel,
    221 U.S. 508 (1911).......................................14, 18

i

Hooker v. Klein,
    573 F.2d 1360 (9th Cir. 1978)...................................16

**Federal Cases**

In re Kaine,
    55 U.S. 103 (1852)...........................................17

In re Ryan,
    360 F. Supp. 270 (E.D.N.Y.)..................................15

Jhirad v. Ferrandina,
    536 F.2d 478 (2d Cir. 1976)..................................14

Jimenez v. Aristeguieta,
    311 F.2d 547 (5th Cir. 1962).................................11

Kolovrat v. Oregon,
    366 U.S. 187 (1961)..........................................19

Lo Duca v. United States,
    93 F.3d 1100 (2d Cir. 1996)...................................8

Lopez-Smith v. Hood,
    121 F.3d 1322 (9th Cir. 1997).....................8, 10, 16, 18

Mainero v. Gregg,
    164 F.3d 1199 (9th Cir. 1999)....................15, 16, 19

Manta v. Chertoff,
    518 F.3d 1134 (9th Cir. 2008).................................7

Martin v. Warden,
    993 F.2d 824 (11th Cir. 1993)..............................8, 14

Matter of Extradition of Kraiselburd,
    786 F.2d 1395 (9th Cir. 1986)................................14

Matter of Extradition of Pazienza,
    619 F. Supp. 611 (S.D.N.Y. 1985).............................12

Matter of Extradition of Strunk,
    293 F. Supp. 2d 1117 (E.D. Cal. 2003)....................11, 19

Matter of the Extradition of Manzi,
    888 F.2d 204 (1st Cir. 1989).............................13, 18

Messina v. United States,
    728 F.2d 77 (2d Cir. 1984)...................................14

Oen Yin-Choy v. Robinson,
   858 F.2d 1400 (9th Cir. 1988)..................................14

Ordinola v. Hackman,
   478 F.3d 588 (4th Cir. 2007)...............................9, 18

Ornelas v. Ruiz,
   161 U.S. 502 (1896)........................................14

**Federal Cases**

Pettit v. Walshe,
   194 U.S. 205 (1904)........................................12

Prasoprat v. Benov,
   421 F.3d 1009 (9th Cir. 2005).........................passim

Quinn v. Robinson,
   783 F.2d 776 (9th Cir. 1986)...................10, 13, 15, 17

Sayne v. Shipley,
   418 F.2d 679 (5th Cir. 1969)...............................15

Shapiro v. Ferrandina,
   478 F.2d 894 (2d Cir. 1973).................................9

Sidali v. I.N.S.,
   107 F.3d 191 (3d Cir. 1997)................................17

Sumitomo Shoji America, Inc. v. Avagliano,
   457 U.S. 176 (1982)....................................10, 19

Terlinden v. Ames, 184 U.S. 270 (1902)........................12

United  States v. Tuttle,
   966 F.2d 1316 (9th Cir. 1992)..............................12

United States ex rel. Rauch v. Stockinger,
   269 F.2d 681 (2d Cir. 1959)................................14

United States ex rel. Sakaguchi v. Kaulukukui,
   520 F.2d 726 (9th Cir. 1975)...............................14

United States v. Alvarez-Machain,
   504 U.S. 655 (1992)........................................12

United States v. Khan,
   993 F.2d 1368 (9th Cir. 1993)..............................13

iii

United States v. Wiebe,
    733 F.2d 549 (8th Cir. 1984).....................................9

Valencia v. Limbs,
    655 F.2d 195 (9th Cir. 1981)...................................13

Ward v. Rutherford,
    921 F.2d 286 (D.C. Cir. 1990)..............................11, 19

**Federal Statutes**

18 U.S.C. § 1956...........................................21, 22

18 U.S.C. § 3181...............................................19

**Federal Statutes**

18 U.S.C. § 3184..........................................passim

18 U.S.C. § 3186............................................8, 17

18 U.S.C. § 3190...............................................16

21 U.S.C. § 952............................................20, 21

**Federal Rules**

Fed. R. Crim. P. 54(b)(5)......................................14

Fed. R. Evid. 1101(d)(3).......................................15

**Other Authorities**

General Order 05-07........................................11, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

The Government of Australia has formally requested that the United States arrest and extradite the fugitive Rusty Steven Setser ("Setser" or "fugitive") so that he may answer to charges of (1) conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine and (2) dealing with the proceeds of crime worth $100,000 or more.  Australia's formal extradition request – supported by appropriate documents, including a copy of the extradition treaty in effect between the United States and Australia – was filed by the United States on June 7, 2013 ("Formal Papers").[1] Included among the Formal Papers is a copy of the extradition treaty currently in effect between the United States and Australia.  US-Austl., May 14, 1974, 27 U.S.T. 957, as supplemented and amended by the Protocol Amending the 1974 Extradition Treaty with Australia, U.S.-Austl., Sept. 4, 1990, S. TREATY DOC NO. 102-23 (1993) (collectively referred to as "Treaty" or "Extradition Treaty").  (Ex. A at 6-45.)

By statute, this Court must now hold a hearing to consider the evidence of criminality presented by Australia and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.  If the Court finds the evidence sufficient, the Court must certify that conclusion to the Secretary of State, who decides whether to surrender the fugitive.  Id.

---

[1]  For the Court's convenience, the United States has filed a sequentially numbered version of the Formal Papers with this memorandum as Exhibit A.  All references to the Formal Papers in this memorandum are to Exhibit A.

1

Because the law regarding extradition is <u>sui generis</u>, differing substantially from ordinary criminal or civil proceedings, the United States offers this memorandum as a guide to the nature of the extradition hearing and the application of its distinctive features to the facts of this case

## II.   STATEMENT OF FACTS

### A.   THE FUGITIVE AND THE OFFENSE CONDUCT

On December 2, 2007, Australian Customs and Border Protection Service ("Customs") seized a package containing 12 blocks of compressed white powder weighing approximately 5.3 kilograms, which was later determined to contain approximately 2.8 kilograms of pure cocaine, from a trash bin on board United Airlines flight UA 839 from Los Angeles to Sydney.  (Ex. A at 72.)  Based on this seizure, the Australian Federal Police ("AFP") began an investigation into the importation into Australia of cocaine via commercial airline flights from the United States.  (<u>Id.</u>)  The investigation revealed that Setser and others had conspired with an Australian criminal syndicate to obtain cocaine for sale in Australia.  (<u>Id.</u> at 72-82.)  As part of the conspiracy, drug couriers hid cocaine on airplanes traveling from the United States to Australia.  (<u>Id.</u>)  Upon arrival in Australia, the syndicate used employees of Gate Gourmet, an airline catering company, to remove the hidden cocaine.  (<u>Id.</u>)  The syndicate then sold the cocaine in Australia, and syndicate members wired proceeds from the drug sales to Setser and other co-conspirators in the United States.  (<u>Id.</u>)

The AFP investigation revealed that between July and November 2007, various members of the conspiracy wired money totaling in excess of A$250,000 from Australia to the United States.  (<u>Id.</u> at

82.)  The payments originated in Sydney, Australia, and were mostly directed to Setser and his co-conspirator and girlfriend, Brandi Brandt.  (Id. at 82-85.)  Setser himself received A$138,205 in total, which represents various remittances sent to Setser by various co-conspirators while they were in Australia.  (Id. at 73.)  The money is believed to be the proceeds of crime derived from undetected importations of cocaine that occurred on July 23, 2007, September 16, 2007, September 23, 2007, and October 16, 2007, dates which coincide with the arrival of members of the conspiracy on flights to Sydney which were serviced by an Australian co-conspirator who is also a Gate Gourmet employee.  (Id.)

Australian law enforcement conducted extensive analysis of telephone records, reviewed international money remittance records, and conducted electronic and physical surveillance of a number of persons in Australia and the United States believed to be involved in the conspiracy.  (Id. at 72.)  Specific events involving Setser include, but are not limited to, the following:

- On July 23, 2007, co-conspirator C.S. arrived in Sydney from the U.S.  He returned to the U.S. on September 10, 2007.  During the time in which C.S. was in Australia, Western Union records show that C.S. wired money to Setser seven times for a total of A$55,250 and made two payments of A$4,525 each to Setser and Brandt.  Furthermore, text messages from C.S.'s mobile phone include several text messages from R.S. sent between September 1, 2007 and September 8, 2007.  In one message, sent on September 8, 2007, R.S. writes: "Thankyou [sic] brother! Over all job well done! Time to come home and enjoy!  Then u know what all over again!  This time we get ours

3

brother! It is going to be nice can't wait, then we really get to enjoy brother, reward ourselves with a few nice toys whatever that maybe!..." (Id. at 73-74.)

- On August 12, 2007, co-conspirator J.P. flew from Sydney to Los Angeles, returning on September 16, 2007 on United Airlines flight UA839, which was serviced in Sydney by co-conspirator J.A., a Gate Gourmet employee, according to United Airlines records. On September 19 and 20, 2007, J.P. made three payments to Setser totaling A$25,400. On September 19, 2007, J.P. also made a payment to Brandt for A$8,000. (Id. at 83.)

- On September 23, 2007, co-conspirator C.S. arrived in Sydney on United Airlines flight UA839, which was also serviced by co-conspirator J.A. C.S. returned to the United States on September 29, 2007. During the six days C.S. was in Australia, bank records show that C.S. made six payments to Brandt in the United States for A$41,810 total. In addition, on September 27 and 28, 2007, co-conspirator B.C. made two payments for A$18,195 total to Setser from Australia via Western Union. And, on September 28, 2007, co-conspirator C.M. in Australia sent an additional A$8,625 to Setser via Western Union. (Id. at 75, 84.)

- In a series of text message exchanges from October 4 to October 14, 2007, which were obtained and reviewed by Australian authorities, Setser discusses an upcoming trip from Los Angeles to Sydney with co-conspirator W.C. Specifically, (1) on October 4, 2007, W.C. texted Setser: "U fly out on the 14th and arrive Syd the 16th reference number vdj506.7zu7jh. Receipt No. 7zu72006hrcpt0234."; (2) on October 11, 2007, W.C. texted

4

Setser "Get what u can keep them separate its bone dry bring at least 2." A few minutes later, W.C. sent a follow-up text saying "Make sure of the weight there all been way under. 1st 1 was 100 under then 89. Looks bad." (<u>Id.</u> at 75-76.)

- On October 14, 2007, Setser boarded United Airlines flight UA839 from Los Angeles to Sydney, scheduled to arrive on October 16, 2007. According to United Airlines records, flight UA839 was scheduled to be serviced by co-conspirator J.A. At 10 p.m. on October 14, 2007, Setser sent co-conspirator W.C. a text message saying, "That's it! Real quick side left one." Australian investigators believe that in this message Setser used coded language to tell W.C. that he had obtained cocaine and hidden it in the left of the two bathrooms on the right wing of the aircraft. Three minutes after receiving this message from Setser, W.C. sent a text message to co-conspirator C.N., an employee of Gate Gourmet. (<u>Id.</u> at 76, 85.)

- Upon arrival in Sydney, Setser was questioned by the Department of Immigration and Multicultural Affairs ("DIAC") and Customs Officers. Setser was refused entry into Australia and returned to the U.S. on October 18, 2007. On October 23, 2007, co-conspirator J.P. sent A$7,790 to Setser in the United States via St. George Bank. (<u>Id.</u> at 75, 85.)

- On November 4, 2007, Brandt arrived in Sydney on American Airlines Flight AA 7302. Before returning to Los Angeles on November 7, 2007, Brandt wired eight payments from Australia into her own account in the U.S., totaling A$71,650, according to records obtained from the Commonwealth Bank of Australia,

Bank of China, Westpac Bank, Travelex, and the ANZ Bank. (Id. at 76.)

- On November 20, 2007, and November 21, 2007, co-conspirators G.B. and M.S., respectively, booked seats on United Airlines Flight UA839 to Sydney, scheduled to arrive on December 2, 2007. On November 24, 2007, co-conspirator J.P. purchased an airline ticket for Setser on the same United Airlines flight. On November 28, 2007, Setser submitted several online applications for a visa to travel to Australia, all of which were rejected by DIAC. The next day, November 29, 2007, Brandt purchased a ticket on the same United Airlines flight. On November 30, 2007, G.B., M.S. and Brandt departed Los Angeles for Sydney on Flight UA 839. (Id. at 77.)

- At about 8:50 a.m. on December 2, 2007, Customs officers at Sydney Airport conducted a search of flight UA839 and seized 12 packages containing approximately 2.8 kilograms of pure cocaine. Subsequent forensic testing of the inside and outside of the cocaine wrappings indicated the presence of G.B.'s DNA on seven of the packages. At the same time, United Airlines records show co-conspirator C.N., a Gate Gourmet employee, departed the tarmac in the vicinity of United Airlines flight UA839. Another employee recalls C.N. saying, "Come on, let's go strip a United flight." C.N. then called the employee back when he saw that the plane was being searched. C.N.'s usual responsibilities did not include servicing United Airlines airplanes after a flight. (Id. at 78.)

- At 9:15 a.m., Brandt left the Sydney Airport and travelled to the Swiss Grand Resort and Spa in Bondi Beach, New South Wales.

6

On December 3, 2007, at around 8:57 a.m., co-conspirator W.C. entered the foyer of the Swiss Grand Resort and Spa, appeared to speak to reception staff, and walked toward the hotel elevators.  At about 9:40 a.m. on December 3, 2007, AFP saw Brandt and W.C. walk through the foyer and leave the hotel separately.  Brandt booked a flight back to Los Angeles for the same day.  (Id. at 78.)

**B.    CRIMINAL CHARGES AND ARREST WARRANT FILED IN AUSTRALIA**

Setser was charged in Australia with conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine, in violation of section 307.1 and section 11.5 of the Criminal Code, and dealing with the proceeds of crime worth $100,000 or more, in violation of section 400.4(1) of the Criminal Code.  (Ex. A at 49-50).  A warrant for his arrest was issued on March 31, 2011 by an authorized officer of the Local Court at Sydney, New South Wales.  (Id.)

**C.    AUSTRALIA'S REQUEST FOR EXTRADITION AND SETSER'S ARREST IN THIS DISTRICT**

In accordance with Article XI of the Treaty, the Embassy of Australia submitted Diplomatic Note No. 115/2012 formally requesting the extradition of Setser, a United States citizen.  (Id. at 4-5.)

On May 29, 2013, Robyn Bacon, Assistant United States Attorney for the Central District of California, filed a Complaint for Arrest Warrant and Extradition, seeking a warrant for Setser's arrest.  An arrest warrant was issued on the same date, and Setser was arrested in this district by deputies of the United States Marshals Service on May 30, 2013.  Setser appeared in court on May 30, 2013, and was

ordered detained.[1]  The original Formal Papers bearing ribbons and seals, which are certified by the principal United States diplomat or consular officer in Australia as required by Article XI of the Treaty, as replaced by Article 7 of the 1990 Protocol, were filed on June 7, 2013.  (Dkt. No. 13; Ex. A at 1-5.)

Setser is currently in federal custody at the Metropolitan Detention Center in Los Angeles.

**III. APPLICABLE LAW**

**A.   GENERAL STANDARDS AND PROCEDURES OF EXTRADITION LAW**

"The extradition process is ordinarily initiated by a formal request from a foreign government to the Department of State, which along with the Department of Justice, evaluates whether the request is within the scope of the relevant extradition treaty between the United States and the requesting nation."  Barapind v. Reno, 225 F.3d 1100, 1105 (9th Cir. 2000); see also Manta v. Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008) ("'Extradition from the United States is a diplomatic process' that is initiated when a foreign nation requests extradition of an individual from the State Department." (citation omitted)); Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009 (9th Cir. 2000).  "Once approved, the United States Attorney for the judicial district where the person sought is located files a complaint in federal district court seeking an arrest warrant for the person sought."  Barapind, 225 F.3d at 1105; see also Cornejo-Barreto, 218 F.3d at 1009.

---

[1]  This matter was assigned Central District of California Case No. 13-1474-M, which was later consolidated with Case No. 13-CV-3924. (See Dkt. No. 15.)

1    A hearing is then held before a federal judge to determine
2 whether the offense is extraditable and probable cause exists to
3 sustain the charges. Barapind, 225 F.3d at 1105; Cornejo-Barreto,
4 218 F.3d at 1009. Ultimately, however, it is the Secretary of
5 State, and not the court, who makes the decision regarding whether
6 the fugitive should be surrendered to the requesting country. 18
7 U.S.C. §§ 3184, 3186; Martin v. Warden, 993 F.2d 824, 828 (11th Cir.
8 1993); Lo Duca v. United States, 93 F.3d 1100, 1104 (2d Cir. 1996).
9 The Executive Branch remains primarily responsible for extradition,
10 while the extradition judge is assigned the limited duty of
11 determining whether the evidence is "sufficient to sustain the
12 charge." 18 U.S.C. § 3184; Blaxland v. Commonwealth Director of
13 Public Prosecutions, 323 F.3d 1198, 1208 (9th Cir. 2003) ("American
14 judicial officers conduct a circumscribed inquiry in extradition
15 cases"); Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir. 1997)
16 ("Extradition is a matter of foreign policy entirely within the
17 discretion of the executive branch, except to the extent that [a]
18 statute interposes a judicial function.").

19    At the extradition hearing, the court must consider the
20 evidence presented on behalf of the requesting country and determine
21 whether the legal requirements for certification, as defined in the
22 treaty, statutes, and case law, have been established. Prasoprat v.
23 Benov, 421 F.3d 1009, 1014 (9th Cir. 2005) ("The only purpose of the
24 extradition hearing is for the magistrate judge to determine whether
25 the crime is extraditable and whether there is probable cause to
26 support the charge."). If any explanatory evidence is offered by
27 the fugitive, the court rules on its admissibility. Once the
28 evidentiary record is complete, the court must make a determination

of extraditability -- written findings of fact and conclusions of
law as to each of the elements for certification, including separate
findings for each offense as to which extradition is sought.  See
Shapiro v. Ferrandina, 478 F.2d 894, 905-06 (2d Cir. 1973).  If the
court determines that the fugitive is wanted for an extraditable
offense and that there is probable cause to support the charge
against him or her, the court must certify to the Secretary of State
that the individual is extraditable.  See 18 U.S.C. § 3184;
Prasoprat, 421 F.3d at 1014; Ordinola v. Hackman, 478 F.3d 588, 597
(4th Cir. 2007).

     If the court certifies the evidence to the Secretary of State,
the court must commit the fugitive to the custody of the United
States Marshal to await the further determination by the Secretary
regarding surrender to the representatives of the requesting state.
The court also must provide its certification to the Secretary of
State together with a copy of the evidence and a transcript of any
testimony presented at the hearing.  18 U.S.C. § 3184; see also
Ordinola, 478 F.3d at 597.

     **B.   STANDARDS OF TREATY INTERPRETATION IN EXTRADITION
          PROCEEDINGS**

     When interpreting an extradition treaty, the court must
construe the treaty's provisions liberally, in a manner favoring the
obligation to surrender fugitives.  See Factor v. Laubenheimer, 290
U.S. 276, 293-94, 298, 303 (1933); United States v. Wiebe, 733 F.2d
549, 554 (8th Cir. 1984); Cucuzzella v. Keliikoa, 638 F.2d 105, 107
n.3 (9th Cir. 1981) ("treaties should be construed to enlarge the
rights of the parties").  Moreover, the obligation to surrender the
fugitive to be tried for his or her alleged offenses "should be

construed more liberally than a criminal statute or the technical requirements of criminal procedure." <u>Factor</u>, 290 U.S. at 298. Accordingly, "[f]orm is not to be insisted upon beyond the requirements of safety and justice," <u>Fernandez v. Phillips</u>, 268 U.S. 311, 312 (1925), and objections that "savor of technicality" do not find favor in extradition proceedings, <u>see</u> <u>Bingham v. Bradley</u>, 241 U.S. 511, 517-18 (1916).

Statements by the United States Department of State as to interpretation of treaties should be given great weight by the court.  <u>El Al Israel Airlines, Ltd. v. Tseng</u>, 525 U.S. 155, 168 (1999); <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

## C.    REQUIREMENTS FOR CERTIFICATION OF EXTRADITABILITY

An extradition certification is proper where:  (1) the extradition judge has authority to conduct the proceeding; (2) the extradition court has jurisdiction over the individual sought; (3) the extradition treaty is in force; (4) the fugitive's crime falls within the treaty's terms; and (5) there is probable cause as to each charge for which extradition is sought.  <u>See</u> 18 U.S.C. § 3184; <u>see also</u> <u>Fernandez</u>, 268 U.S. at 312; <u>Prasoprat</u>, 421 F.3d at 1013; <u>Cornejo-Barreto</u>, 218 F.3d at 1009-10.  If these elements are present, the court must certify the extradition, <u>see</u> <u>Lopez-Smith</u>, 121 F.3d at 1324-26, unless the case falls within an exception explicitly set forth in the treaty, <u>see, e.g.</u>, <u>Quinn v. Robinson</u>, 783 F.2d 776, 783 (9th Cir. 1986) (political offense exception in U.S.-United Kingdom extradition treaty).

### 1. The Court's Authority to Conduct Extradition Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184.  Consequently, both magistrate judges and district judges may render a "certification" under Section 3184.  See Austin v. Healey, 5 F.3d 598, 601-02 (2d Cir. 1993) (magistrate judge had authorization to conduct the extradition hearing without specific delegation of authority); Jimenez v. Aristeguieta, 311 F.2d 547, 553-55 (5th Cir. 1962) (any judicial officer in class authorized by statute may conduct extradition hearing).

In addition, the United States District Court for the Central District of California, by local rule, has authorized magistrate judges to conduct extradition proceedings.  See General Order 05-07; see also Matter of Extradition of Strunk, 293 F. Supp. 2d 1117, 1119-20 (E.D. Cal. 2003) (both statute and local rule authorized magistrate judge to conduct extradition proceedings); Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990) (both statute and local rule made plain magistrate judge's authority to conduct extradition hearing).

### 2. Jurisdiction Over the Fugitive

It is also well settled that the court has jurisdiction over a fugitive found within its jurisdictional boundaries.  18 U.S.C. § 3184 (court "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"); see also Pettit v.

12

1    *Walshe*, 194 U.S. 205, 219 (1904); Matter of Extradition of Pazienza,
2    619 F. Supp. 611, 616 (S.D.N.Y. 1985).

3              **3.   Treaty in Full Force and Effect**

4         The extradition statute, 18 U.S.C. § 3184, provides for
5    extradition in instances in which a treaty or convention is in force
6    between the requesting state and the United States.  See, e.g., Then
7    v. Melendez, 92 F.3d 851, 853-54 (9th Cir. 1996); United States v.
8    Tuttle, 966 F.2d 1316, 1317 (9th Cir. 1992).  In this case, the
9    government has provided a declaration from Susan Benda ("Benda
10   Declaration"), an attorney in the Office of the Legal Adviser of the
11   United States Department of State, attesting that there is a treaty
12   in full force and effect between the United States and Australia.
13   (Ex. A at 1).  The Department of State's determination is entitled
14   to deference from the court.  Terlinden v. Ames, 184 U.S. 270, 288
15   (1902); Then, 92 F.3d at 854.

16             **4.   Crimes Covered by the Treaty**

17        Extradition treaties create an obligation for the United States
18   to surrender fugitives under the circumstances defined in the
19   treaty.  United States v. Alvarez-Machain, 504 U.S. 655, 664 (1992)
20   ("Extradition treaties exist so as to impose mutual obligations to
21   surrender individuals in certain defined sets of circumstances,
22   following established procedures.").

23        This "dual criminality" requirement does not mean that the
24   Australian crimes must be identical to a United States offense; all
25   that is required under extradition law is that the underlying acts
26   be punishable under both legal systems.  See Collins v. Loisel, 259
27   U.S. 309, 312 (1922) ("The law does not require that the name by
28   which the crime is described in the two countries shall be the same;

                                    13

nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."); Emami v. U.S. District Court for N. Dist. Cal., 834 F.2d 1444, 1450 (9th Cir. 1987) (same); United States v. Khan, 993 F.2d 1368, 1372 (9th Cir. 1993) ("Many cases have held that dual criminality is satisfied even though the names of the crimes and the required elements were different in the two countries."); Cucuzzella, 638 F.2d at 108 ("The crimes need not be identical.").

Indeed, Article II (3) of the Extradition Treaty, as modified, provides that an offense is an extraditable offense "whether or not the laws in the Contracting Parties place the offence within the same category of offences or describe the offence by the same terminology."  (Ex. A at 30-31.)

In determining whether an offense is punishable under the laws of both countries, courts properly look to the underlying acts to determine whether they violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states.  See Cucuzzella, 638 F.2d at 107; Matter of the Extradition of Manzi, 888 F.2d 204, 207 (1st Cir. 1989).

### 5.   Probable Cause that the Fugitive Committed the Offense

An extradition hearing is not intended to determine whether the evidence is sufficient to justify conviction, for that determination will be made by the foreign court that handles the case.  See Collins, 259 U.S. at 316; Quinn, 783 F.2d at 815; Valencia v. Limbs, 655 F.2d 195, 198 (9th Cir. 1981).  The court need only determine

whether there is probable cause that the fugitive committed the offense or offenses for which extradition is sought.  Ornelas v. Ruiz, 161 U.S. 502, 512 (1896).  Addressing this context, the Ninth Circuit has said that "[t]he magistrate's function is to determine whether there is 'any' evidence sufficient to establish reasonable or probable cause."  United States ex rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 730-31 (9th Cir. 1975).  As to the form of the evidence, extradition is proper where the standard is met even if the proof "is presented . . . in somewhat untechnical form according to our ideas."  Glucksman v. Henkel, 221 U.S. 508, 512 (1911) (affirming extradition despite minor or technical objections).

### D. INAPPLICABILITY OF FEDERAL RULES OF CRIMINAL PROCEDURE AND EVIDENCE

The Federal Rules of Criminal Procedure do not apply to extradition proceedings.  Fed. R. Crim. P. 54(b)(5) ("[t]hese rules are not applicable to extradition and rendition of fugitives").  Nor is a fugitive entitled to other rights normally available in a criminal trial.  See, e.g., Charlton v. Kelly, 229 U.S. 447, 461 (1913); Glucksman, 221 U.S. at 512; United States ex rel. Rauch v. Stockinger, 269 F.2d 681, 687 (2d Cir. 1959).  For example, the fugitive has no right to cross-examination if any witnesses testify at the hearing, Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984), no right to a speedy extradition, see Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1398 (9th Cir. 1986); Martin, 993 F.2d at 825, 829-30; Jhirad v. Ferrandina, 536 F.2d 478, 485 n.9 (2d Cir. 1976), and generally no right to discovery, see Prasoprat, 421 F.3d at 1014; Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1407 (9th Cir. 1988).

The Federal Rules of Evidence are also inapplicable in extradition proceedings.  Fed. R. Evid. 1101(d)(3) (rules of evidence inapplicable to "proceedings [for] extradition or rendition").  Rather, "[u]nique rules of 'wide latitude' govern reception of evidence in Section 3184 hearings."  Sayne v. Shipley, 418 F.2d 679, 685 (5th Cir. 1969) (citation omitted).  For example, hearsay is permitted.  Id.; Collins, 259 U.S. at 317, 42 S. Ct. at 472; Mainero v. Gregg, 164 F.3d 1199, 1206 (9th Cir. 1999) (extradition case: "it is well settled in this circuit that evidence is not incompetent simply because it is hearsay"); Emami, 834 F.2d at 1451 ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings.").  Indeed, "[a] determination of probable cause in an extradition proceeding may rest entirely upon hearsay."  In re Ryan, 360 F. Supp. 270, 273 (E.D.N.Y.).

Further, extradition treaties do not contemplate the introduction of testimony of live witnesses at extradition proceedings.  "[A]n extradition proceeding is not a trial.  Indeed, the very purpose of extradition treaties is 'to obviate the necessity of confronting the accused with the witnesses against him.'"  Mainero, 164 F.3d at 1207 (citation omitted); see also Bingham, 241 U.S. at 517 (requiring "the demanding government to send its citizens to another country to institute legal proceedings[] would defeat the whole object of the treaty"); Quinn, 783 F.2d at 815-16 ("Barring hearsay from extradition proceedings would thwart one of the objectives of bilateral extradition treaties . . . .").

1    Documents offered in evidence at an extradition hearing shall

2    be received if they are "properly and legally authenticated." 18

3    U.S.C. § 3190. Article XI, paragraph 5(a) of the Extradition

4    Treaty, as modified by the 1990 protocol, provides that "documents

5    which accompany an extradition request shall be received and

6    admitted as evidence in extradition proceedings if they are

7    certified by the principal diplomatic or consular officer of the

8    United States resident in Australia." (Ex. A at 36.) The documents

9    presented by the United States in this case have been certified in

10   that manner. See Benda Decl., ¶ 6; (Ex. A at 3.)

11       **E.   LIMITATIONS OF FUGITIVE'S EVIDENCE**

12       The fugitive's grounds for opposing an extradition request are

13   limited. The fugitive is not entitled to introduce evidence that

14   contradicts the evidence submitted by the requesting state,

15   establishes an alibi, or presents a defense such as insanity. See

16   Charlton, 229 U.S. at 462; Hooker v. Klein, 573 F.2d 1360, 1369 (9th

17   Cir. 1978); Desmond v. Eggers, 18 F.2d 503, 505 (9th Cir. 1927).

18   Nor may a fugitive offer evidence to argue that he or she had no

19   motive to commit the crime. Mainero, 990 F. Supp. at 1221. Nor is

20   a fugitive's competence to stand trial relevant at an extradition

21   hearing. Charlton, 229 U.S. at 462; Lopez-Smith, 121 F.3d at 1324-

22   25. Rather, the fugitive is entitled only to offer evidence that

23   explains or clarifies the proof. Hooker, 573 F.2d at 1368; Eain v.

24   Wilkes, 641 F.2d 504, 511 (7th Cir. 1981). As the Ninth Circuit has

25   explained: "Generally, evidence that explains away or completely

26   obliterates probable cause is the only evidence admissible at an

27   extradition hearing, whereas evidence that merely controverts the

28   existence of probable cause, or raises a defense, is not

                                    17

1    admissible." <u>Mainero</u>, 164 F.3d at 1207 n.7.  Hence, the court does

2    not weigh conflicting evidence and determine what to credit, "but,

3    rather, determines only whether there is competent evidence to

4    support the belief that the accused has committed the charged

5    offense." <u>Quinn</u>, 783 F.2d at 815.

6        **F.   MOTIVATION OF AND EXPECTED TREATMENT IN DEMANDING COUNTRY:
             THE RULE OF NON-INQUIRY**

7        Other than the sufficiency of the evidence, all matters that

8    may be raised by the fugitive as defenses to extradition are to be

9    considered by the Secretary of State, not by this Court.  <u>See</u> 18

10   U.S.C. §§ 3184, 3186.  In making extradition determinations, "[t]he

11   Secretary exercises broad discretion and may properly consider

12   factors affecting both the individual defendant as well as foreign

13   relations -- factors that may be beyond the scope of the magistrate

14   judge's review." <u>Sidali v. I.N.S.</u>, 107 F.3d 191, 195 n.7 (3d Cir.

15   1997).  The Secretary takes into account humanitarian claims and

16   applicable statutes, treaties, or policies regarding appropriate

17   treatment in the receiving country.  <u>See</u> <u>Prasoprat</u>, 421 F.3d at

18   1016.  This is consistent with the long-held understanding that

19   surrender of a fugitive to a foreign government is "purely a

20   national act . . . performed through the Secretary of State," within

21   the Executive's powers to conduct foreign affairs.  <u>See</u> <u>In re Kaine</u>,

22   55 U.S. 103, 110 .

23       Therefore, under this constitutionally-based rule of judicial

24   non-inquiry, a fugitive's contention that the extradition request is

25   politically motivated or that the justice system of the requesting

26   state is unfair should be addressed by the Secretary of State, not

27   the court.  It is not the role of the court to look behind the

28

extradition request to the motives of the requesting country.  <u>E.g.</u>,
<u>Ordinola</u>, 478 F.3d at 604 ("the motives of the requesting government
are irrelevant to our decision" and "must be addressed to the
Secretary of State"); <u>Eain</u>, 641 F.2d at 513 (sole discretion of
Secretary of State to determine whether foreign country's request
for extradition is a subterfuge).  Likewise, the court should not
investigate the fairness of the requesting country's criminal
justice system or the treatment that might be accorded the fugitive
after extradition.  <u>See</u> <u>Prasoprat</u>, 421 F.3d at 1016 (rule of non-
inquiry applies to treatment fugitive is likely to receive upon
return); <u>Cornejo-Barreto</u>, 218 F.3d at 1009 n.5 (rule of non-inquiry
usually requires extradition courts to refrain from inquiring into
foreign justice systems); <u>Lopez-Smith</u>, 121 F.3d at 1327 (courts
generally refrain from examining penal systems of requesting
nations); <u>Arnbjornsdottir-Mendler v. United States</u>, 721 F.2d 679,
683 (9th Cir. 1983) ("The rationale is that such matters are to be
determined solely by the executive branch."); <u>accord</u> <u>Matter of the</u>
<u>Extradition of Manzi</u>, 888 F.2d at 206.  As Justice Holmes said,
"[w]e are bound by the existence of an extradition treaty to assume
that the trial will be fair." <u>Glucksman</u>, 221 U.S. at 512.

**IV. ARGUMENT**

In the present case, the elements for extradition have been
met.  There is subject matter and personal jurisdiction over the
fugitive.  A valid extradition treaty permits extradition for the
offenses charged against the fugitive in Australia.  Finally, there
is probable cause to believe that the fugitive committed the
offenses charged.

**A.   THE COURT HAS SUBJECT MATTER JURISDICTION**

United States Magistrate Judges are authorized to act in extradition matters.  See 18 U.S.C. § 3184; see also General Order 05-07; Matter of Extradition of Strunk, 293 F.Supp.2d at 1119-20; Ward, 921 F.2d at 287.

**B.   THE COURT HAS PERSONAL JURISDICTION OVER THE FUGITIVE**

A magistrate judge in the Central District of California has jurisdiction over Setser because he is presently in custody in this district.  Mainero, 990 F.Supp. at 1216.  Setser is "found within [this] jurisdiction," the jurisdictional requirement of 18 U.S.C. § 3184.

**C.   THE EXTRADITION TREATY IS IN FORCE**

There is an extradition treaty in full force and effect between the United States and Australia.  See Benda Decl., ¶ 3; (Ex. A at 1).  See also 18 U.S.C. § 3181 (Historical and Statutory Notes). The State Department's conclusion that the Treaty is in full force and effect, as expressed in the Declaration of Susan Benda, is entitled to considerable deference.  See Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."); accord Sumitomo, 457 U.S. at 184-85; Charlton, 229 U.S. at 468; see also Mainero, 990 F. Supp. at 1216-17 (giving deference to State Department's opinion that extradition treaty was in full force and effect).

**D.   THE FUGITIVE IS SOUGHT FOR OFFENSES COVERED BY THE EXTRADITION TREATY**

As noted earlier in this memorandum, Article II of the Extradition Treaty provides that an extraditable offense under the Extradition Treaty is an offense "if it is punishable under the laws in both Contracting Parties by deprivation of liberty of more than one year... whether or not the laws in the Contracting Parties place the offence within the same category of offenses or describe the offence by the same terminology."  (Ex. A at 30.)

Setser has been charged in Australia with (1) conspiracy to import a commercial quantity of a border controlled drug, namely, cocaine, in violation of section 307.1 and section 11.5 of the Criminal Code, and (2) dealing with the proceeds of crime worth $100,000 or more, in violation of section 400.4(1) of the Criminal Code.  In order for a person to commit conspiracy, "(a) the person must have entered into an agreement with one or more persons; and (b) the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and (c) the person or at least one other party to the agreement must have committed an overt act pursuant to the agreement."  Australian Criminal Code, § 11.5; (Ex. A at 51).  A person commits the offence of importation of a controlled substance if "(a) the person imports or exports a substance; and (b) the substance is a border controlled drug or border controlled plant; and (c) the quantity imported or exported is a commercial quantity."

Australian Criminal Code, § 307.1; (Ex. A at 51).  Cocaine is a border controlled drug and 2.0 kilograms or more is a commercial quantity.  Australian Criminal Code, § 314.4; (Ex A. at 51).  The maximum penalty for an offense of conspiracy to import a commercial quantity of a border controlled drug is imprisonment for life or a fine of $825,000 or both.  Australian Criminal Code, § 307.1(1); (Ex. A at 51).

A person is guilty of dealing with the proceeds of a crime worth $100,000 or more if "(a) the person deals with money or other property; and (b) either (i) the money or property is, and the person believes it to be, proceeds of crime; or (ii) the person intends that the money or property will become an instrument of crime; and (c) at the time of the dealing, the value of the money and other property is $100,000 or more."  Australian Criminal Code, § 400.4(1); (Ex. A at 52-53).  The punishment is up to 20 years imprisonment.  Id.

in the United States, Setser's crimes are punishable as, among other things, Importation of Controlled Substances and Laundering of Monetary Instruments, in violation of 21 U.S.C. § 952 and 18 U.S.C. § 1956, respectively.  Under § 952, it is "unlawful to import into the United States from any place outside thereof" certain controlled substances, including cocaine.  See 21 U.S.C. § 952(a), 812(c) Schedule II (a)(4).  Importation of 500 grams or more of cocaine carries a maximum penalty of 40 years imprisonment.  21 U.S.C. §

960(a)(1), (b)(2)(B)(ii).  A person violates 18 U.S.C. § 1956 if the person "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity..." 18 U.S.C. § 1956(a)(1)(A)(i). Laundering of monetary instruments is punishable by up to 20 years imprisonment.  Id.

### E.   THERE IS PROBABLE CAUSE TO BELIEVE THAT BRANDT COMMITTED THE OFFENSES CHARGES

The Article XI, paragraph 3 of the Extradition Treaty requires that an extradition request be supported by "a description of the facts, by way of affidavit, statement, or declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it."  Ex. A at 34-35.  This language means that the federal probable cause standard is the applicable criterion.  See Emami, 834 F.2d at 1447; Eain, 641 F.2d at 507-08.

The facts summarized above and set forth in the extradition request submitted by Australia establish probable cause to believe that Setser committed the crimes charged.  The investigator's affidavit also outlines the evidence in support of each count.  (See Ex. A at 72-85.)  The evidence shows that from about July 24, 2007 to December 2, 2007, in Sydney, Australia and elsewhere, Setser conspired with others to import over two kilograms of cocaine into Australia and that from July 24, 2007 to November 7, 2007, Setser,

23

in Sydney and elsewhere, Setser dealt with approximately A$138,205 in proceeds from a crime by sending and receiving drug proceeds from Australia.

These facts and the evidence that supports them appear to satisfy the elements of conspiracy to import a border controlled substance and dealing with the proceeds of a crime worth more than $100,000 under Australian law and importation of a controlled substance and laundering of monetary instruments under United States law.

Thus, there is probable cause to believe that Setser committed the crimes charged. There is also probable cause to believe that the person in these proceedings is Rusty Steven Setser, the person named in the Australian arrest warrant. This is based on the following: (1) the person in these proceedings has admitted his true name to be Rusty Steven Setser at multiple court appearances; (2) the photographs that are included in the Formal Papers plainly depict the person who is involved in these proceedings; and (3) the date of birth and height included in the Formal Papers also are consistent with the appearance of the person in these proceedings. (See Ex. A at 67, 87.)

//

**V.    CONCLUSION**

For the foregoing reasons, the United States requests the certification of the fugitive, RUSTY STEVEN SETSER, for extradition to Australia because each of the elements required for extradition has been met.

Dated: July 8, 2013                     Respectfully submitted,

                                        ANDRÉ BIROTTE JR.
                                        United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                        _____/s/_____
                                        ROBYN K. BACON
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

25